[Sac. No. 1128.  In Bank.—October 1, 1907.]

# FRANK REEVE, Respondent, v. COLUSA GAS AND ELECTRIC COMPANY, Appellant.

Negligence—Failure to Inform Employee—Wires Charged with Electricity.—The failure of a master to inform an employee, directed to work near electric wires, that the wires are live, in the absence of knowledge of the employee, is negligence.

Review of Conflicting Evidence—Inferences.—Where the verdict of the jury is for the plaintiff and a new trial is refused this court cannot reconsider conflicting evidence to determine the correctness of the decision. The evidence and inferences in favor of the verdict must be considered as true, and of two conflicting inferences the one in favor of the verdict must be taken. The court will not review conflicting evidence.

Electric Currents—Operation of Two-Phase System—Knowledge of, not a Matter of Law—Absence of Knowledge not Negligence.—That the economic operation of a two-phase electric system requires the current to be used on both phases at the same time is not a fact of scientific knowledge so generally known at the present time as to charge an employee with such knowledge as a matter of law, and in the absence of scientific or special knowledge it is not negligence for him to believe that the wires of one phase are dead while those of the other phase are live.

Failure to Inquire not Contributory Negligence as to Unexpected or Undisclosed Danger.—The failure of the employee to inquire about remote risk of his employment is not contributory negligence as to an unassumed danger of which the master negligently failed to inform him. Failure to inquire about the condition of wires is not contributory negligence where it is customary to turn off the current when employees were working.

General Instruction—Master and Servant—Diligence of Servant—Performance of Details—Duty of Master to Warn as to Details.—In performance of a general order a servant does not exceed instructions in performing its details. The absence of specific instructions as to performance of details does not excuse the master from warning and protecting the servant as to all dangers that he will usually incur in the diligent discharge of his duties, as are not known to the servant, obvious to ordinary observation, and arise from causes controlled by the master.

Electric Currents—Charged Wires—Duty of Master—Rights of Servant.—A servant directed to work near electric wires controlled by the master is not required at his peril to ascertain if the wires are charged. It is the duty of the master to use reasonable care to keep the wires where the servant is directed to work free from cur-

rents, or to give the servant warning of the danger and all instructions necessary to enable him to avoid them so far as may be reasonably possible and compatible with the work.

MASTER AND SERVANT—PLACE OF WORK—ASSUMPTION AS TO SAFETY.— If the master gives an order to work at a particular place and gives no warning of danger, the servant may rightfully assume it to be free from danger from causes under the master's control, and which he could remove with reasonable care and effort, and which are not apparent to the servant after such observation as the circumstances reasonably require.

CONTRIBUTORY NEGLIGENCE — FAILURE TO INQUIRE—ASSUMPTION OF RISK.—Where the servant is directed to work near wires which he believes to be dead, and where he is not informed and has no specific knowledge that they are live, and where it is customary to turn off the current where the employees work, although he knows the danger of live wires, he is not guilty of contributory negligence in working near them without inquiring as to their condition, and he does not assume as a risk of his employment, the danger of the wires being charged.

NEGLIGENCE OF FELLOW SERVANT—HOW INVOKED.—The defense of negligence of a fellow servant cannot be invoked unless it be pleaded.

PERSONAL INJURIES—DAMAGES NOT EXCESSIVE.—The verdict of thirty thousand dollars under the facts of the case is not excessive.

APPEAL from a judgment of the Superior Court of Colusa County and from an order refusing a new trial. H. M. Albery, Judge.

The facts are stated in the opinion of the court.

Garret W. McEnerney, W. B. Treadwell, Seth Wellington, J. W. Goad, and William M. Pierson, for Appellant.

Garber, Creswell & Garber, J. L. Geary, Jr., and Milton Shepardson, for Respondent.

SHAW, J.—This is an action to recover damages caused by personal injuries. There was a verdict and judgment in favor of the plaintiff for thirty thousand dollars, a motion for a new trial was denied, and from the judgment and order defendant appeals.

The complaint avers that the plaintiff, a lineman in the employ of the defendant, engaged in the construction of an electric system for the distribution of electric light and power to the city of Colusa and its inhabitants, was directed by the

defendant to ascend one of its poles situated at Fifth and Jay streets, in said city, and to attach thereto a cross-arm and transformer; that at the top of the pole, fourteen inches above the place where the cross-arm and transformer were to be affixed, there were certain wires attached for use in carrying a current of electricity, and constituting a part of said system; that about the time plaintiff, in obedience to said directions, ascended said pole and began said work, the defendant, without plaintiff's knowledge, caused a heavy current of electricity to be turned on and transmitted through said wires, making them very dangerous, and making the place where the plaintiff was so set to work a very dangerous place; that defendant failed and neglected to inform plaintiff that said current was turned on to said wires, or to give him any warning of the danger therefrom; that plaintiff did not know that the electric current had been turned on, or was being carried through said wires, or that they were in a dangerous condition, but believed them to be free from such current and harmless; that while so engaged at such work plaintiff was likely to come in contact with said wires, and that, without fault on his part, he did come in contact therewith, received a heavy charge of said electricity, and was very greatly injured thereby, particularly describing his injuries.

It is to be noted that it is not claimed that the plaintiff was not fully aware of the fact that an electric shock would inflict great injury and that it was highly dangerous to get in contact with the wires when charged with an electric current. The evidence shows that he had full knowledge of that danger, and also that the defendant had informed him of the fact and warned him not to touch a live wire. He freely admitted all this. The neglect of which plaintiff complains is the failure of the defendant to inform him that the wires, near which he was set to work, were then charged with electricity. The answer makes a complete denial of all the facts charged. Upon the trial, however, it was not disputed that the current was turned on to the wires in question a short time before plaintiff was set to work on the pole.

The claims of the defense are: 1. That the plaintiff, though not directly informed of the switching of the current to the wires in question, had knowledge of facts which, in connection with the warnings which were given him, were sufficient to put

him on inquiry, and charge him with contributory negligence if he failed to apprehend that the current was on and to act accordingly; 2. That the instructions given him by the defendant went no farther than to require him to affix the cross-arm, which he did in safety; that in subsequently proceeding to fasten the pulley to the top of the pole, nearer the wires, preparatory to raising the transformer therewith, he was acting voluntarily without instructions from defendant, that no duty was cast on defendant to caution him as to a danger which it did not direct him to incur, and that it is not liable for the injury from such voluntary exposure; 3. That as the plaintiff confessedly knew of the danger attending proximity to live wires, he was guilty of negligence if, upon going near a wire in performance of his duty as a servant, he failed to make due inquiry and ascertain beforehand that the wire carried no electric current; 4. That the danger which caused the injury was one of the ordinary risks of his employment, assumed by the plaintiff himself, for the consequences of which the defendant is not liable; 5. That the turning on of the current and the failure to tell the plaintiff thereof, were the acts of a fellow servant, for which the defendant is not responsible; and, 6. That the damages are excessive.

1. At the time of the injury the defendant's system of wires was divided into two separate circuits, usually called "phase A" and "phase B," respectively; one carrying a positive and the other a negative current of electricity, and one serving one part of the city of Colusa and the other the remaining part thereof. The system had then been in operation but a short time. The wires from which the plaintiff was injured were those of "phase A." It is conceded that Reeve knew that the current had been turned on to the wires of "phase B," but there is no evidence that he was ever informed that it was also turned on to those of phase "A," where he was then at work. Did the facts known to him impute to him such knowledge of the working of the system that his failure to apprehend that the wires of phase "A" were also charged was contributory negligence on his part?

This is a question of fact, to be decided in the first place by the jury. That decision was in favor of the plaintiff, and the trial court refused a new trial. Hence, this court cannot

reconsider any conflicting evidence to determine how it ought to have been decided. We are bound to consider as true all the evidence in favor of the plaintiff, as well as all reasonable inferences that may be deduced therefrom, and, if two or more inferences may reasonably arise, to take that most favorable to plaintiff. The evidence must be considered in the light of these rules.

For some months prior to the injury the defendant had been constructing its electric system for Colusa. Reeve had been assisting in the work during the entire period of its construction, first as a laborer and then as a lineman. He had had some previous experience as a machinist and in working on an electric plant, and, at the time of the injury, he had a general practical knowledge of the constructive work of such a system, so far as the lines, poles and apparatus connected with and attached thereto were concerned, and considerable knowledge of the practical operation and effects of electricity. The city had been lighted from defendant's system for about three weeks at the time of the injury, which occurred on September 25, 1901. Up to September 20th the current had been used only at night for lighting the city. On or about the 20th a motor was installed in the *Sun* printing office, to which power was supplied in the daytime. So far as Reeve knew, or had been informed, the *Sun* motor was situated in the district exclusively supplied from phase "B." On the morning of the accident, Reeve, with one Putman, also a lineman, and one Howard, as foreman, set out with the purpose, announced by Howard then and on the previous day, to take down a transformer from a pole in Chinatown, on the phase "B" circuit, carry it to the corner of Fifth and Jay streets, and there put it up on a pole carrying the wires of phase "A." They proceeded to the Chinatown pole, took down the transformer and put up a smaller one in its place, the current to the *Sun* office being turned off for their safety while so engaged, as Reeve knew. As soon as this was done Putman was told by Howard to go to the power-house and turn the current on, so that it could be used at the *Sun* office. Reeve heard this order, understood its purpose and saw Putman depart to obey it. Reeve then took the large transformer and the tools in a handcart to the pole at Fifth and Jay streets. At the top of that pole were some wires of phase "A." In

proceeding with the work of attaching the transformer, he came in contact with these wires and was injured by the current. A few days previously, unknown to him, the wires of phase "A" had been extended to the *Sun* office, and Putnam had turned the electric current on to both phases.

On the vital question whether or not Reeve should have known that Putman would turn on both phases, or was justified in believing, as the evidence shows he did believe, that it was turned on phase "B" only, the facts known to him and which are to be considered as imputing to him such knowledge, if he is to be so charged, were as follows: During the few weeks that the current had been used for lighting the city it had been the invariable custom, when turning on the current for lighting, to turn on both phases at the same time. The wires of phase "A" ran to one part of the city and those of phase "B" to another, so that, in order to light the whole of the city, it was necessary to turn on both phases. There is no evidence that Reeve knew of any other reason for turning on both phases, and we must assume that the jury determined correctly that he knew of no other reason, unless such knowledge is implied by law. On September 14th, by the fall of a hammer on his head, he was injured to such an extent that he did not work until September 20th, and during that time he did not know of the progress of the work nor of the customary operation of the system. On September 14th no wires were up along the street on which the *Sun* office was situated, except those of phase "B," and there is no evidence that he knew of any intention to extend the wires of phase "A" thereto. While he was laid off work the wires of phase "A" were, without his knowledge, extended along the street on which the *Sun* office was situated and connected with the *Sun* motor. In taking the detached transformer from the Chinatown pole to the Fifth and Jay streets pole, he passed under those wires of phase "A" while going from Sixth Street to Fifth Street, and, if he had looked up, he would have seen them, and by further examination he could easily have discovered that they extended down Sixth Street to the *Sun* office. He knew the danger from live wires and had been instructed by the defendant's manager never to work around wires which were carrying the current, and while taking down the transformer from the Chinatown pole,

although the current was off, he was told to be careful of the current. He also knew that in some parts of the defendant's system, though not at the place of the injury, the wires of the two phases were run along the same poles and were close together for a considerable distance, and that if a live wire touched a dead one and the insulation was not good, the dead wire might be infused with electricity. It had always been the custom of the defendant to turn off the current while men were connecting or disconnecting transformers.

These facts do not warrant the conclusion, as a matter of law, or as a necessary inference of fact, that Reeve should have known that the current was on the wires at Fifth and Jay streets at the time he was injured. There was evidence on behalf of the defendant to the effect that when electricity is operated in two separate currents or phases, carried on different wires, it is necessary to the economical management of the system and to the proper "balancing" of the currents, that both phases be turned on at the same time, but that they would work separately, though not so well, or so ecomonically. Reeve testified that he had no knowledge of this fact. It is not, in the present state of scientific knowledge, a fact so generally known that it has become a matter of common knowledge of which all must take notice, and hence Reeve cannot be charged with such knowledge as matter of law. The verdict implies that the jury believed his testimony that he did not know it, and their decision is conclusive here. The custom, during the brief period of the operation of the system, of turning on both phases to light the city was, to one of his knowledge and information, completely explained by the fact that it was necessary to do so for that purpose, else one district of the city would be illuminated and the other dark. No scientific or special knowledge was brought home to him, which required him, in the exercise of reasonable prudence, to inquire for other reasons for the custom. At the time he passed along the street under the wires of phase "A" running to the *Sun* office, he was propelling a handcart loaded with the large transformer and the tools and machinery for attaching it to the other pole. It does not appear that anything occurred to cause him to look upward, or to call his attention to the wires overhead. It was for the jury to say whether or not he should have observed them and should

have followed up the inquiry to ascertain what current they carried and where they led, and the jury has decided in his favor. Any person not informed in regard to the scientific operation of electricity might reasonably suppose that the motor at the *Sun* office was operated by a single phase, and that if it was located (as Reeve supposed) upon one of the phases only, it would be operated by that phase alone. And having been ordered to work upon a pole carrying wires of the other phase only, without warning to the contrary, it was not unreasonable or necessarily negligent for Reeve to believe that those wires were not at that time charged with electricity. Under all the circumstances, it was, at most, a question for the jury, and the verdict concludes us.

The crossing of the wires of the two phases was a thing which might occur at any moment. It would be very infrequent unless the defendant was negligent. The danger arising from the fact that it might occur at a time that would afford no opportunity for the defendant to warn him was one of the risks of his employment. (20 Am. & Eng. Ency. of Law, pp. 57, 119.) It is not claimed that any means existed, or had been furnished to Reeve, whereby the wires could be tested by him before going close to them. It is true that if he had been sufficiently alarmed at the possibility to have made inquiry about crossed wires, he might, in guarding against a non-existent danger, have received warning as to the real danger. But the failure to make such inquiry concerning this remote danger can scarcely be deemed, as matter of law, such contributory negligence concerning another danger of which defendant negligently failed to inform him, as to defeat his action for injuries arising from the latter.

Other facts were proven by the defendant which, if known to Reeve, would possibly have been sufficient, in connection with the facts above stated to be known to him, to have informed him that the current would be turned on both phases. It was shown that the *Sun* motor was a two-phase motor, made to be worked by both phases at once, that the wires of phase "A" had been extended to the *Sun* office, as stated, that that motor, after installation, had been uniformly operated by both phases at once, and that the custom of turning on both phases to light the city was principally due to the necessity of doing so to "balance" the currents and thus

secure economy and efficiency, and not simply for the purpose
of lighting all parts of the city. But he was ignorant of all
these things. He believed that a motor could be run as well
by one phase as by both. He is not shown to have had knowl-
edge or information which, as matter of law or proof, con-
clusively demonstrates that he was negligent in failing to per-
ceive that the current would be turned on both phases to oper-
ate the *Sun* motor, or in assuming, without further or special
inquiry, that the wires at the top of the pole at Fifth and Jay
streets, which he knew belonged to phase ''A,'' were dead.

It is suggested that the wires were themselves a sign of dan-
ger which made it negligence for him to work near them with-
out inquiry as to their condition. Inasmuch as it had been
the custom always to turn off the current when men were
connecting a transformer, and he had been put to work at
that operation in close proximity to the wires, the jury were
authorized to conclude that he was not negligent in assuming
without further inquiry that the wires were dead, as he
actually believed them to be.

It cannot be said that he had good reason to believe or that
he knew that the *Sun* office was supplied from phase ''A.''
While working on the Chinatown pole, which was on phase
''B,'' he knew the current was turned off those wires to allow
him to work in safety, and that it was to be turned on at
once for the use of the *Sun* office. This was practically direct
information to him that it was supplied from that phase, and
if he did not know that the concurrent use of the two phases
was necessary or customary, he would have no occasion to
suspect that the other phase was also used there.

The proposition that the evidence of contributory negli-
gence in this respect is such as to require a reversal of this
judgment, can only be supported by a disregard of the rule
that this court will not weigh conflicting evidence. In order
to reach such conclusion this court must proceed to consider
the weight of the evidence and determine whether or not the
jury decided according to its preponderance, a thing which
it has neither the right nor the lawful power to do.

2. The claim that he exceeded his instructions is also unten-
able. It is true that after Reeve had affixed the cross-arm,
he was not then specifically or expressly directed to prepare
for hoisting the transformer. But under the circumstances

shown, an express order was not necessary. He was told a day or two before, and also on that morning, that he was to assist the others in removing the transformer from the Chinatown pole and affixing it to the pole at Fifth and Jay streets. As a lineman, his part of such work consisted in climbing the poles, detaching and attaching the transformer and affixing the necessary cross-arm on which to place the transformer. After affixing the cross-arm, the next act in the process was to attach a pulley at some point on the pole far enough above the cross-arm to allow the hoisting of the transformer to the cross-arm by means of a rope through the pulley. To attach the pulley at the proper place, it was necessary to climb the pole to the top, where the electric wires were strung. Being a skilled and experienced lineman, Reeve knew all these details as well as if they had been expressly mentioned. The general order was, to him, the equivalent of a specific instruction as to each detail. He had been told by the foreman that there was haste required to get the transformer in place in time to furnish the electricity through it for the Catholic fair soon to be held near by. After the cross-arm was attached, and while he was near the top of the pole, he saw the other men on the ground below getting ready to throw to him the rope necessary in hoisting the block and tackle thereafter to be used in raising the transformer and he also saw the foreman take the handcart containing the transformer to run it up under the pole. Howard had told the plaintiff before that he wanted to get the transformer up as soon as he could. In view of all these circumstances and statements, as a diligent and faithful servant he would be required to assume, or at least would be justified in assuming, as he did, that the transformer was to be immediately hoisted, and in preparing to do his part by ascending the pole far enough to attach the pulley at the proper place. If he had been slow to perceive these preparations, and dilatory in his part of the work, awaiting a specific direction for each act in the process, he would have been justly chargeable with inefficiency and neglect of duty. It would be strange doctrine to hold that the promptness of a servant in going forward to perform the well-known parts of a task he is set to do would relieve the master from his duty to furnish a safe place and warn the servant of the dangers of the situation to which his duty calls him. The master expects and is entitled to the

exercise by the servant of reasonable zeal to see and do what is to be done by him in the course of the work in which he is engaged. Expecting this, he must anticipate it in the performance of his own duty to the servant, and his warnings and protection must extend to all dangers which the servant will usually incur in the exercise of such reasonable zeal and diligence, as are not known to the servant, or obvious to ordinary observation, and which arise from causes controlled by the master. The plaintiff's diligence did not go beyond this ordinary and reasonable diligence to which he was bound. Under all the circumstances of the case the master cannot be allowed to excuse himself on the ground that specific directions to attach the pulley were not given by Howard to Reeve. The foreman, it is true, had decided to postpone the raising of the transformer until after the lunch hour, but he had said nothing to that effect, and he was proceeding with his part of the work as if he expected to raise it immediately. The plaintiff was, therefore, authorized to assume that he also was expected to proceed as he did.

3. There is no established rule of law to the effect that a servant, when directed to work near wires of an electric system controlled by the master, must, at his peril, ascertain whether or not the current has been regularly turned on at the time. Such a rule would tend to embarrass the master in the work by causing continual delays while the servant was prosecuting his inquiries. In such cases it is the duty of the master to use reasonable care to so control and manage the ordinary operation of the system and the places where the servant is put to work, that the wires shall be free from dangerous currents under the master's control while such work is in progress, or to give the servant warning of the danger and all instructions necessary to enable him to avoid them so far as may be reasonably possible and compatible with the nature of the work. If the master gives the order to work at a particular place and gives no warning of danger, the servant may rightfully assume it to be free from danger from causes under the master's control, and which he could remove with reasonable care and effort, and which are not apparent to the servant, after such observation as the circumstances reasonably require. (20 Am. & Eng. Ency. of Law, pp. 73, 88; *Silveira* v. *Iverson,* 128 Cal. 192, [60 Pac. 687] ; *Dyas* v.

*Southern Pacific Co.,* 140 Cal. 309, [73 Pac. 972].) Although he knew the dangerous character of live wires, Reeve was not, as matter of law, negligent, under the circumstances, in working near them without inquiry in regard to the current of electricity. It was a question properly submitted to the jury. This also disposes of the fourth proposition,—that is to say, that the danger was one of the risks of the plaintiff's employment, which he assumed himself and for which the master is not liable.

4. The answer does not aver that the persons whose negligence caused the injury were fellow servants of plaintiff. This defense cannot be invoked unless it is pleaded. (*Layng* v. *Mt. Shasta Co.,* 135 Cal. 143, [67 Pac. 48] ; *Peters* v. *McKay,* 136 Cal. 73, [68 Pac. 478].) There is no specification that the evidence is insufficient to show that the negligence which caused the injury was that of the principal and not of a fellow servant. For these reasons the question whether the foreman, Howard, was, with respect to the duty to turn off the current or warn Reeve of the danger, a fellow servant of Reeve, cannot be considered.

5. It is impossible adequately to describe the suffering and misery—past, present, and future—inflicted upon the plaintiff as a consequence of the injury. The verdict is large, the amount of damage was a question for the jury, subject to the supervision and correction of the trial court, and having been passed by the latter without disapproval, it is not for us to say, under the circumstances, that it is excessive.

The judgment and order are affirmed.

Angellotti, J., Beatty, C. J., and Allen, J., *pro tem,** concurred.

We dissent, and adhere to the opinion heretofore rendered herein in Department.

McFarland, J., Henshaw, J., and Lorigan, J.

* NOTE.—Justice Sloss being disqualified, Justice Allen, one of the justices of the district court of appeal for the second appellate district, participates herein *pro tempore,* pursuant to section 4 of article VI of the constitution, and order filed September 18, 1907, pursuant thereto.

The following is the opinion rendered in Department Two on September 30, 1905, adhered to by Justices McFarland, Henshaw, and Lorigan:—

HENSHAW, J.—Plaintiff, a lineman, in the employ of defendant, came in contact with an electric current upon defendant's wires, and received permanent and shocking injuries. He brought his action for damages for these injuries and recovered judgment. From that judgment and from the order denying its motion for a new trial defendant appeals.

The two principal contentions of defendant are that the evidence fails to establish any negligence on its part toward its employee, and, second, that the evidence affirmatively establishes the employee's contributory negligence.

The two propositions may be considered together on the following statement of facts: Plaintiff, while not a scientific electrician or electric engineer, was a skilled and experienced lineman. He had entered the employ of the defendant company and had assisted in the general work of erecting poles, running wires, and placing transformers. He had been in the employ of the defendant before it actually commenced its business of furnishing electric power and light. He was familiar with the construction of the entire system. He understood the difference between direct and alternating currents. He was familiar with the construction and use of the switchboard. He understood generally the nature and was familiar with the workings of the system. He had previously been employed by the San Jose Railway Company as electrician and machinist, and had been injured by coming in contact with a live wire. He knew when a wire had become infused with electricity. He had been called into consultation with reference to the apparatus and machinery in the sub-station generally. He was able to turn on or off any current if so instructed. He was acquainted with and understood what was meant by "phase A" and "phase B." He had assisted in constructing "phase A" and "phase B," and understood the details. He was quite familiar with the methods of operating the power and knew when it was turned off and on. He was injured on the twenty-fifth day of September, 1901. About ten days before this date, while at work, a hammer fell on his head and he temporarily "laid off" from the fourteenth

to the twentieth of September. On the twentieth day of September he returned to work, and spent the next five days building a switch-board. At the time he was injured by the falling of the hammer three currents were in use by the company: a current for supplying arc lights, carrying a voltage of 110; and two alternating currents ("phase A" and "phase B") for incandescent lights, carrying a voltage of 2300. These currents for the incandescent lights were known as primary currents. "Phase A," "phase B," and the arc-light current were each two-wire currents,—that is to say, two wires for each of the three currents ran from the sub-station through the town of Colusa. It appears that in the economical administration of the system it was necessary that the current should be turned on and off "phase A" and "phase B" together. The current upon "phase A" or "phase B" could be cut off and the one current used independently of the other, but this was never done, as it impaired the efficiency of the service and of the machinery. In practice, therefore, these two currents were always turned on or cut off together. Plaintiff knew this practice, knew that such was the "custom" of the company, but did not understand scientifically why the practice was adopted. Respondent's witness Putnam furnishes additional proof of this practice in the following language: "Referring to the custom of the defendant company, it was customary to turn on both phases when we turned on one, an unvarying custom so far as I know. I never heard of an instance when one phase of an electric and light power system was turned on when another corresponding phase was not turned on to balance it, except in cases when we wanted to test some particular piece of work. The customary meaning of the phrase 'to turn the current on,' the custom of the electric company, of its foreman and manager and as the term is used with all the employees—that would mean to turn all the currents on of the two phases, and the customary meaning of the phrase 'to turn the current off' would be to turn the current off both phases." There was but one occasion within the plaintiff's knowledge when the two currents of "phase A" and "phase B" were not operating concurrently, and upon that occasion it was plaintiff himself who cut off one of the phases. He testifies: "There was one time when one of the phases was turned off and the other remained

on. On the night when Hamburg's saloon burned, at the fire alarm, I went down and turned out the 'B' phase. I know of no other time." Plaintiff further explains why upon that occasion he turned off the "B" phase. The firemen were working in close proximity to this phase and using a great deal of water, and he was afraid that some one might come in contact with the current. In substantiation of this custom of the defendant company, plaintiff further testifies: "I do not remember that I ever heard an order to turn on a specific current of the power and light phases. I do not know of an order ever given in the town of Colusa to turn on one current."

Before the time of plaintiff's injury, the defendant company had been supplying incandescent lights through phases "A" and "B" to the town of Colusa. The service of the defendant to this time had been a night service. The currents were turned on between five and six in the afternoon and turned off before working hours the next day. While plaintiff was recovering from his injury, the printing office of the Colusa *Sun* took electricity to run a motor, and this electricity was supplied from phases "A" and "B." Plaintiff knew from his reading, and from conversation that took place upon the day of his accident, that the Colusa *Sun* was using electricity for power, and knew that electricity was supplied by defendant company from one of its phases, but did not know that it was supplied in conjunction by the two phases. During the time that plaintiff was ill from the effects of the blow of the hammer, the wires of "phase B" had been carried into the office of the Colusa *Sun,* and the wires of "phase A" had been extended from the pole on Fifth and Jay streets, where the accident occurred, to the same office and connected with the same motor. Upon the day of the accident, plaintiff, with Howard, the foreman, and Putnam, a fellow employee, had gone to Chinatown to take down a transformer connected with "phase B," and substitute therefor one of lesser lighting capacity. Plaintiff's work as lineman was to climb the pole, make the necessary changes, and, with the assistance of the others, lower the old transformer and hook the new one in place over a cross-bar. This work was done, of course, while the current was off. Having been successfully performed, plaintiff testifies: "Howard and Putnam each called

my attention to the fact that the power must be turned on as soon as the transformer was placed. I understood it must be turned on. Putnam got on a bicycle and went down to turn it on. I told him I was now ready for him to turn it on, and started to climb down the pole. I understood that the power was to be turned on for the motor at the Colusa *Sun* office. I understood that a motor had been placed in the *Sun* office to operate their machinery in the printing establishment. I understood that it was to be operated in the daytime. At this time I did." It appears, therefore, that plaintiff knew, at least, that the *Sun* office was taking power in the daytime and that the power had been turned on as soon as he had descended from the pole along which ran the wires of "phase B." He knew, also, that, at least, the Colusa *Sun* was supplied with power by "phase B," and he knew also the invariable practice of the company to turn the currents of both phases on at the same time. This indisputably was the knowledge which he took with him to Fifth and Jay streets—his next place of working. The pole at Fifth and Jay streets, where the accident occurred, carried the wires of "phase A." They had, as has been said, been extended from that point on to the office of the Colusa *Sun*. The extension of these new wires was, of course, visible. Plaintiff reached the pole at Fifth and Jay streets, accompanied by Howard and Putnam. He climbed the pole as directed, to put another cross-arm fourteen inches below the cross-arm which carried "phase A," to which new cross-arm was to be hung the transformer which had been brought from Chinatown. This work could be, and was, performed with perfect safety, notwithstanding the fact that the current was on the wire of "phase A" above. It is important here to note just what was the particular work which plaintiff was at that time called upon to do, and the evidence is indisputable that his orders or directions went no further than the placing of the cross-arm. He testifies that when he started from Chinatown to the pole on Fifth and Jay streets, "Howard asked if I had a cross-arm and I answered yes." When he reached the spot he says: "I took what tools then that I needed and went up the pole. The tools I took were a saw, brace and bit, wood-chisel, hammer, pliers, connectors and two screwdrivers, such things as I always carried—my belt tools— and proceeded up the pole to put on the cross-arm to hold the

transformer.'' He further testified: ''I next saw Howard and Putnam a few minutes before I was hurt. The cross-arm was up. Putnam sighted the cross-arm for me to see that it was level and I put on the two braces. This was done after they were there. During the time after I had finished placing the cross-arm, Howard at no time instructed or directed me with reference to placing the transformer or issued any instructions or directions at all. He said nothing to me in any way, simply went to work with the transformer, I knowing that was next to go on. He was in no mood to be questioned that day. Putnam said nothing to me with reference to placing the transformer.'' Howard testifies that after finishing the work in Chinatown he ''told Reeve to go down to the corner of Roach's across from the armory and put a cross-arm up there.'' And further he testifies: ''I can give no explanation or reason why plaintiff should have ascended to the top of the pole based upon anything I had said to him or any order or direction. There was no occasion, need or necessity for him to ascend to the top of the pole in order for him to place the cross-arm as I had ordered and directed him.'' And again: ''I remember clearly the specific directions that I gave plaintiff with reference to the work he was to do on the pole on the corner of Fifth and Jay. I told him to put a cross-arm on that pole. I am positive I told plaintiff to put up a cross-arm and that only.'' The cross-arm having thus been placed in position, plaintiff's own testimony is that, without any further direction, he climbed to the top of the pole, came in contact with the live wires of ''phase A,'' and received his injuries. He says: ''I then climbed up the pole to take in the situation below me preparatory to fastening a rope and raising the transformer. By 'take in the situation' I mean the situation I saw below and its position and the transformer that he had there working with and the position of Putnam and what he was doing and causing the hand-line to be thrown up.''

From plaintiff's own testimony, therefore, it appears that of his own initiative, after having set the cross-bar, he climbed to the top of the pole to take in the situation and was there hurt. He did this without any directions and without anything to prompt him so to do, for it appears that the transformer was not ready to be set in place, and that it was in the

contemplation of Howard to have it set at the noon hour, after the power had been turned off. But conceding that plaintiff knew nothing of Howard's intention, still he did know the custom of the company invariably to turn on the two phases at the same time, and he knew also positively that the current in at least one of the phases (phase "B") had been turned on to supply the Colusa *Sun*. Needlessly climbing into the wires to the top of the pole, and coming into contact with the live wires of "phase A," under these circumstances, was, as matter of law, contributory negligence. True, he testifies, as anyone would testify, truthfully, that he would not have climbed to this dangerous position if he had knowledge that the current was running over those wires. But this statement cannot relieve against the undisputed facts. He was an experienced man, he did have knowledge of the uniform habit and practice of the company in regard to turning on the two currents, and the conclusion is inevitable that this knowledge had temporarily slipped his mind in a moment of forgetfulness. But for such forgetfulness the defendant company cannot be held responsible. There was no failure of duty upon the part of the employer. The plaintiff's knowledge, experience, and skill relieved the company from the necessity of giving warnings which under other circumstances, it might have been its duty to give. As plaintiff himself testifies, "If I had known that both currents would have been turned on I would have known that the wires on the pole where I was injured were live wires." And, again, having testified that upon one occasion he was warned, he says: "On no other occasion during my work for the company was I warned by any person representing the company with reference to being careful in working with live wires. I never had occasion to be warned." It appears, therefore, irresistibly that, with full knowledge of the danger and risk of his employment, and chargeable with knowledge sufficient to warn him of the danger of climbing to the top of the pole, amongst wires which he should have remembered were probably carrying a current, he did this act either recklessly or in a moment of forgetfulness. Sad and deplorable as the consequences were to him, he alone, under the evidence, is responsible for them.

Certain preliminary objections of the respondent to the hearing of this appeal are without substantial merit. On the

day after the verdict was rendered the attorneys for the plaintiff entered into a stipulation with the attorney for the defendant wherein defendant was given thirty days in addition to the time allowed by law within which to serve and file its notice of intention to move for a new trial, its bill of exceptions, statements, or motions in the matter of a new trial, and for the purpose of securing a new trial of the cause. The defendant's attorney construed this stipulation as giving defendant thirty days in addition to the time allowed by law within which to serve his notice of intention to move for a new trial, and also thirty days in addition to the time allowed by law after service of the notice of intention within which to serve the statement on motion for a new trial. The court heard the matter upon the papers and upon affidavits and construed the stipulation in accordance with defendant's understanding. The stipulation was certainly open to this construction, and it was not error for the court so to have construed it.

The second objection urged to the hearing arises from the fact that counsel for plaintiff were brought before the judge to settle the statement without having received any notice from the clerk that the date had actually been appointed for the settlement. The statement of the case was served upon July 12th, the amendment served on August 5th, the statement and amendments delivered to the clerk for the judge on August 12th; the settlement came on to be heard on August 18th. At the time of the settlement plaintiff's counsel made their objection that they had not been notified of the time fixed for the settlement. The court overruled this objection by an order made August 22d. The bill of exceptions was settled on the nineteenth day of September and filed with the clerk upon the twentieth day of September. The objection that the clerk did not notify counsel of the hearing is sufficiently answered by the fact that they were present thereat and made their objection to further proceedings. The objection is extremely technical, and it appears that they were present at the time set for hearing. It is not made to appear that they suffered in any substantial right by failure of the notice, and, moreover, their objection having been overruled upon August 22d, the bill of exceptions was not, in fact, settled until nearly a month thereafter. It thus appears that

there was ample time afforded them for all purposes, and the irregularity impaired none of their rights. The court was, therefore, justified in overruling this objection.

For the foregoing reasons the judgment and order appealed from are reversed.

McFarland, J., and Lorigan, J., concurred.