ARNOLD H. RENEAU, a Minor, etc., Respondent, v. FLORENCE WILE HIRSCH, as Executrix, etc., Appellant.

Haas & Dunnigan and Shaw & McDaniels for Appellant.

Bertrand J. Wellman for Respondent.

PRESTON, J., *pro tem.*—This is an appeal by defendant, Eugene D. Hirsch, from a judgment entered against him upon a verdict of a jury in the sum of $20,719, in an action for damages for personal injuries.

The verdict was divided as follows: $18,000 for physical injuries; $2,719 for medical attention, hospital bills and loss of time.

The essential facts are not in dispute and may be thus briefly stated: The plaintiff and respondent, Arnold H. Reneau, at the time he received the injuries complained of, was a minor of the age of seventeen years, employed as a delivery boy by a grocery store in the city of Ocean Park, and receiving a salary of $18 per week. On July 7, 1923, respondent was removing groceries from his automobile truck, which he had parked near the curb on the east side of

Main Street in the city of Ocean Park, when defendant's automobile, driven by his chauffeur at a high rate of speed, collided with said delivery truck and crushed respondent's left leg between the truck and a telephone pole located near the curb. Respondent's left leg was almost entirely severed from his body above the knee, there being only an anterior flap holding the two parts of the leg together. Numerous pieces of wood, stone, manure, and dirt were ground into respondent's leg. The injury can best be described by quoting a portion of the testimony of Dr. C. P. Thomas, one of the attending surgeons: "As I remember, when I was called to the hospital I found him (referring to respondent) on the operating table with a very bad lacerated wound of the leg. The back part of the leg, just a little ways above the knee, and the bone broken off at that place, and the ends a long ways apart. Nearly all of the soft parts on the flexor side, that is, the under side of the leg, were severed. I found a great deal of timber in the wound, slivers of wood, more or less decayed, and of course he was bleeding and in great pain; suffering a great deal of shock. He had, evidently, lost a great deal of blood before he got to the hospital. My impression is that the flexor muscles were nearly all severed. Those that are definitely flexor muscles. There are some muscles that have other functions than that of flexing and helping to flex, but the main flexor muscles were severed. The bone was exposed for six inches and the lower fragment bent back on itself, or bent back on the joint so that they were overriding. The two ends were four or five inches apart. After cleaning the wound out thoroughly, I drilled a hole through the end of each bone, or the ends of the same bone, and put a silver wire through it and drew them together and twisted the wire up snugly so as to hold the ends together. I then sewed the soft parts, each muscle to its fellow as near as I could. . . . The hemorrhage was quite profuse. He was greatly shocked and white when he came to the hospital. . . . I saw him October 20th and discharged him from the hospital, and there were no discharging wounds and his muscles had united, but they were weak yet and the knee had limited motion only and his general condition was fair. The limb is now somewhat smaller than the other, at the place of

severance of the muscles; there is some enlargement of the knee joint and there is a slight limitation of motion. I think it would be safe to say there is a limitation of somewhere between ten and twenty-five per cent. The limb is not as strong nor as flexible as the other limb by probably twenty per cent.''

The doctor further testified as follows: ''Q. I will ask you to state, doctor, whether in your opinion, this boy is suffering from any permanent injury from this limb? A. Yes, he has some permanent disability . . . Q. In what way does this permanent injury affect him?—How does it incapacitate him? A. Well, he hasn't full—he hasn't the ability— he hasn't the power of flexing the leg. The loss of muscular substance somewhat weakens the ability to flex the leg . . . Q. Have you made comparative measurements of the two limbs to determine the extent of atrophy? A. Not with a tape measure, but only with my eye. Q. Except in the case where the scar tissue occurs, the balance of the leg should, eventually, with normal exercise, return to the same size as its mate? A. Yes, sir . . . Q. Now, what particular motion—limitation of motion—what motion is limited in his leg? A. He is unable to flex his leg more than at right angles . . . Q. The exercise and use will have a tendency to increase his power to flex, and it will also have a tendency to increase the size and strength of the muscles, is that true? A. Yes; and yet I think I should qualify that, in fairness to the boy and to your side as well. The muscle, as it appears now—the muscle ends are not actually together, that I sewed, but instead, a fibrous membrane of scar tissue has united the two ends of the muscle in such a way that they function; *but they do not function as a perfect, smooth-running muscle would, and never will . . . It is a very unusual injury. I don't think I ever saw all of the flexor muscles severed before in a lower extremity. I never saw the flexor muscles about the knee cut off before unless the leg was amputated . . .* ''

The plaintiff was in the hospital for fifteen weeks and after leaving the hospital he walked with the aid of crutches and a cane for a time, and it was not until October, 1924, that he was able to return to work.

Dr. A. H. Jones, also an attending physician, testified in part as follows: "There is an enormous amount of scar tissue where the compound fracture was and it involves all the flexor muscles and all the way down to the bone. The flexor muscles all have scar tissue in them and are joined together by scar tissue. The scar tissue will never be replaced by muscle tissue; conversely, scar tissue always will contract; it will contract appreciably for ten or twelve years; and the converse is going to be true; the scar tissue is going to pinch up more than the muscle tissue as time goes on. That tends to reduce the efficiency of the muscles. It limits the possible increase in the amount of muscle tissue. There is a permanent weakness."

In speaking of the respondent's ability to walk, Dr. Jones further testified: "Of course, he is going to feel it; it is going to be weaker and it is going to tire easier, and it is not going to have the endurance; and in case of going downhill, why, that action of preventing a person from falling forward is going to make it,—he will have to be much more deliberate about his actions,—have to be careful."

In speaking of the wire in respondent's leg, Dr. Jones said: "The first thing that happens is that there is an area of osteoporosis around the wire; and the wire begins to get loose; and there is a constant conscious feeling of something wrong at the seat of the foreign body, and Nature begins to get ready to cast it off; it softens the bone around it . . . I think there is a reasonable probability, wherever you put a foreign body in the tissues, that Nature will finally pass it out . . . It is pretty hard to say what the probable effect will be (referring to the wire in respondent's leg); that is a very good result. Wires do not usually stay in that good; they almost always—Nature resists them and casts them out. I would say, trying to make a conscientious reply, that the chances for a man to live thirty-five years with that wire in there were about fifty-fifty that it would at some time become a foreign body."

The respondent also testified as follows: "Well, if I am walking, my left leg always has to come down; it comes down solid; just straight, instead of like an ordinary person walking, their knees kind of spring. The tendons are stiff . . . Going up and down stairs I always have to put

my right foot up first, because if I bend my left one the muscles and things are not strong enough to pull me up at all on the left leg—I have to watch in walking or I will fall.''

There were other physicians who attended the respondent, and their opinions and conclusions were, in the main, the same as those above quoted.

The record reveals that James A. Reneau, the father of respondent and his guardian *ad litem* in the case at bar, commenced an independent action against defendant and appellant to recover money expended by him for medical services, hospital charges and loss of wages, etc., for respondent, and it was stipulated that his action might be dismissed and that these charges might be considered by the jury in this case, provided the jury determined appellant to be liable.

Only two grounds are urged for a reversal of the judgment. The first and principal contention made is that the verdict is excessive; second, misconduct of the attorney for respondent.

A motion for a new trial was made upon several grounds, among them being "excessive damages, appearing to have been given under the influence of passion or prejudice." (Subd. 5, sec. 657, Code Civ. Proc.) The motion for a new trial was denied.

The rule is well established that the amount of damages in this kind of an action is committed first to the sound discretion of the jury, and next to the discretion of the judge of the trial court, who, in ruling upon the motion for a new trial, may consider the evidence anew, determine anew the facts, and set aside the verdict if it is not just. Upon appeal, the decision of the trial court and the jury on the subject cannot be set aside unless the verdict is ''so plainly and outrageously excessive as to suggest, at first blush, passion or prejudice or corruption on the part of the jury." (*Aldrich* v. *Palmer*, 24 Cal. 516; *Wheaton* v. *North Beach etc. R. R. Co.*, 36 Cal. 591; *Swain* v. *Fourteenth St. R. R. Co.*, 93 Cal. 185 [28 Pac. 829]; *Morgan* v. *Southern Pacific Co.*, 95 Cal. 501 [30 Pac. 601]; *Lee* v. *Southern Pacific Co.*, 101 Cal. 118 [35 Pac. 572]; *Howland* v. *Oakland C. St. Ry. Co.*, 110 Cal. 523 [42 Pac. 983]; *Harrison*

v. *Sutter St. Ry. Co.*, 116 Cal. 156 [47 Pac. 1019]; *Reeve* v. *Colusa G. & E. Co.*, 152 Cal. 99 [92 Pac. 89]; *Hale* v. *San Bernardino etc. Co.*, 156 Cal. 713 [106 Pac. 83]; *Zibbel* v. *Southern Pacific Co.*, 160 Cal. 237 [116 Pac. 513]; *Campbell* v. *Bradbury*, 179 Cal. 364 [176 Pac. 685]; *Bisinger* v. *Sacramento Lodge No. 6*, 187 Cal. 578 [203 Pac. 768]; *Kelley* v. *Hodge Transportation System*, 197 Cal. 598 [242 Pac. 76]; *Smith* v. *San Joaquin etc. Power Corp.*, 59 Cal. App. 647 [211 Pac. 843]; *Anderson* v. *San Francisco-Oakland Rys.*, 61 Cal. App. 21 [214 Pac. 289]; *Holmes* v. *California Crushed Fruit Co.*, 69 Cal. App. 779 [232 Pac. 178]; *Bosse* v. *Marye*, 80 Cal. App. 109 [250 Pac. 693].)

We have carefully examined the entire record, including the evidence, and there is nothing in the record to show or suggest that the verdict was not the result of the fair and honest judgment of the jury. The award of damages made by the jury, and sustained by the trial court, is large, but when the extent and character of the injuries received by respondent, and the intense pain and suffering that he endured for so long, are all considered, we think the award is not at all disproportionate to the compensation reasonably warranted by the facts.

Appellant, in contending that the award of damages is excessive, lays great stress upon the fact that three physicians who examined the respondent just before the trial, which was approximately a year and six months after the injury, testified that there was little or no permanent injury to respondent's leg. This testimony did nothing more than raise a conflict in the evidence, which conflict was undoubtedly resolved in favor of the respondent, and the rule is well settled that in considering an attack upon a verdict as being excessive we must treat every conflict in the evidence as resolved in favor of the respondent, and must give to him the benefit of every inference that can reasonably be drawn in support of his claim. (*Kimic* v. *San Jose-Los Gatos Ry. Co.*, 156 Cal. 273 [104 Pac. 312]; *Riffel* v. *Letts*, 31 Cal. App. 428 [160 Pac. 845].)

It is next contended by appellant that counsel for respondent was guilty of prejudicial misconduct. There is no merit in this contention. During the examination of the jurors on their *voir dire* the following proceedings were

had: "Mr. Wellman (attorney for plaintiff and respondent):
I would like to know if any of the jurors are connected
as a stockholder or otherwise with the Royal Indemnity &
Insurance Company? Mr. Dunnigan (one of the attorneys
for defendant and appellant): I object to that question
and assign it as error. The Court: Objection sustained.
Mr. Wellman: I have an authority that I wish to hand
to your honor. The Court: Very well, show this to counsel,
please. Mr. Dunnigan: I have read the case, if your honor
please, I still desire to urge the objection and take the
court's ruling. The Court: Let me see the case. Mr. Re-
porter, will you read the last question again, please?
(Question read by reporter.) Objection will be overruled.
The jury may answer the question. Mr. Wellman: Are any
of you connected in any way as agents or otherwise or as
a stockholder with the Royal Indemnity Insurance Com-
pany? Jurors: No." This question was entirely proper.
(*Arnold* v. *California Portland Cement Co.*, 41 Cal. App.
425 [183 Pac. 171].)

██ During the cross-examination of Dr. Boehme, a
physician called as a witness by defendant, the following
questions were propounded by plaintiff's counsel: "Q. Do
you examine people who are injured for different Casualty
Companies. A. I do. Q. To what extent do you do that
kind of work? A. Almost exclusively. Q. Your time is de-
voted almost entirely to examining people who are hurt for
Casualty Companies and Insurance Companies, is it?
A. And corporations. Q. What compensation did you re-
ceive for examining this boy? Mr. Dunnigan: Objected to as
immaterial. Mr. Wellman: To show the interest of the wit-
ness. The Court: Overruled. A. Twenty-five dollars. Mr.
Wellman: What compensation do you expect to receive for
appearing here and testifying? Mr. Dunnigan: Objected to
as incompetent, irrelevant and immaterial. Mr. Wellman:
To show the interest of the witness. Mr. Dunnigan: He will
get his money without regard to the results. The Court:
Objection sustained."

Appellant contends that these questions were asked for the
purpose of prejudicing the jury against casualty insurance
corporations in general, and to convey to the jury the im-
pression that appellant was insured against any damages

by reason of the collision. The rule is, of course, well settled that evidence that a defendant in an action for damages is insured against loss by reason thereof is not admissible and it would undoubtedly be improper for counsel for plaintiff to endeavor to get such a fact before the jury by questions designed solely for that purpose. (*Pierce* v. *United Gas Co.*, 161 Cal. 188 [118 Pac. 700]; *Roche* v. *Llewellyn Iron Works*, 140 Cal. 563 [74 Pac. 147]; *Dameron* v. *Ansbro*, 39 Cal. App. 298 [178 Pac. 874]; *Arnold* v. *California Portland Cement Co.*, 41 Cal. App. 425 [183 Pac. 171]; *De Liere* v. *Goldberg, Bowen & Co.*, 30 Cal. App. 612 [159 Pac. 197].)

We are unable to say, however, that the attorney for plaintiff transgressed the above rule in any of his questions, or that any of the questions were not within the bounds of legitimate cross-examination. Moreover, the questions complained of were nearly all answered without objection from defendant.

The attorney for plaintiff did not in any way attempt to prove that defendant was indemnified against loss by reason of the injury to plaintiff. Furthermore, the court expressly instructed the jury as follows: "Ladies and gentlemen of the jury: Before proceeding to give you the instructions in full, the court desires in a preliminary way to instruct you as to two different matters regarding insurance. . . . The fact that you do or do not believe that the defendant is insured by a liability insurance company has nothing whatever to do with the issues of this case. It would be error on the part of this court if it permitted it to be proved that the defendant carries liability insurance; and your verdict in this case, as between the plaintiff and defendant, shall be the same whether you do or do not believe that the defendant carries liability insurance."

We conclude that no prejudicial error was committed by plaintiff's counsel in propounding the questions complained of to appellant's medical experts on cross-examination, and there is nothing in the record from which it could be inferred or insinuated that plaintiff's counsel did not ask said questions in the utmost good faith.

No other points are urged for a reversal of the judgment in this case. It cannot be doubted that plaintiff received

a most unusual and severe injury, and that he suffered great pain and anguish, and that he is to a considerable degree, at least, permanently injured. While defendant denied negligence in his answer, no attempt is made on this appeal to deny that the chauffeur of defendant was negligent.

We find **no** error in the record. The judgment is affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 20, 1928.

All the Justices present concurred.

[Civ. No. 3318.   Third Appellate District.—December 24, 1927.]