[Civ. No. 2659. Third Appellate District.—August 31, 1925.]

THE McCORMICK SAELTZER COMPANY (a Corporation), Respondent, v. GRIZZLY CREEK LUMBER COMPANY (a Corporation), Appellant.

[Civ. No. 2660. Third Appellate District.—August 31, 1925.]

THE REDDING FEED COMPANY (a Corporation), Respondent, v. GRIZZLY CREEK LUMBER COMPANY (a Corporation), Appellant.

[1] CORPORATIONS—AGREEMENT TO PAY CERTAIN DEBTS—OFFICERS AS AGENTS—EVIDENCE—UNEXECUTED WRITING.—In these actions upon an alleged promise of defendant corporation to pay the indebtedness to plaintiffs for certain goods and merchandise sold and delivered to a certain lumber company, the evidence, taken as a whole, was sufficient to support the findings to the effect that two certain individuals who were the president and secretary, respectively, of defendant corporation, acted as its agents in taking over the assets of the properties, and agreeing to pay the outstanding debts, of said lumber company, and that said individuals bound defendant corporation in their promise to pay the obligations of said lumber company; and the trial court did not commit error in excluding as evidence a certain document, in the form of an agreement of sale, wherein said two individuals were named as the purchasers, where such agreement was never signed or accepted by the parties.

[2] ID.—CONDUCT OF OFFICERS—KNOWLEDGE PRESUMED.—Where two individuals promote a corporation, and own practically all the stock, and dominate its affairs, and, together with their attorney, hold the principal offices of the corporation, their conduct, actions

and promises will bind the corporation, and the corporation will be deemed to have knowledge of their conduct and contracts.

[3] Id.—Retention of Fruits—Estoppel to Deny Obligations.— Said corporation, having obtained and held the property constituting a material part of the contract of purchase, will be estopped from denying its obligation to pay the debts, which was a material part of the agreement whereby the lumber company disposed of said property.

[4] Id.—Identity of Corporation and Stockholders—Equity—Contracts Relating to Corporate Business.—While the general rule is that a corporation is an entity separate and distinct from its officers and stockholders, both law and equity will, when necessary to prevent a fraud, protect the rights of third persons, and to accomplish justice, disregard this distinct existence and treat them as identical; and in order to cast aside this legal fiction, the law is not scrupulously particular in discriminating between the contracts of one who practically owns all the stock of a corporation and controls its affairs, as to whether he has executed a contract relating to the corporate business in his individual or corporate capacity.

[5] Id.—Exclusion of Writing—Appeal—Presumption of Incompe-tence.—Where the trial court excludes a written instrument as evidence, but permits it to be marked for identification, it is negligence on the part of the appellant to permit the settlement of a transcript on appeal under the alternative method without including this document, if he wishes to use it on appeal; and where such document is not before the appellate court, it is impossible to determine whether it was competent or not, and, in the absence of any showing to the contrary, the appellate court must assume that the ruling in excluding the document was proper.

[6] Id.—Contents of Writing—Best Evidence.—Where a written instrument is before the court, the instrument itself is the best evidence of the subject matter and of its contents, and an objection to questions asked for the purpose of showing those facts is properly sustained on that ground.

---

(1) 14a **C. J.,** p. 402, n. 68, p. 407, n. 22, p. 408, n. 23, p. 409, n. 25.   (2) 14a **C. J.,** p. 355, n. 98, p. 368, n. 40, p. 387, n. 40, p. 388, n. 41, p. 349, n. 44.   (4) 14a **C. J.,** p. 171, n. 20, 21, p. 361, n. 65, p. 362, n. 69.   (5) 4 **C. J.,** p. 759, n. 65, 67, p. 760, n. 82. (6) 22 **C. J.,** p. 974, n. 59, p. 980, n. 88, p. 986, n. 6.

3.   See 10 Cal. Jur. 647.

4.   Corporation as an entity distinct from its stockholders, notes, 34 Am. St. Rep. 556; 40 Am. St. Rep. 157.   Disregarding corporate existence, note, 1 A. L. R. 610.   See, also, 6 Cal. Jur. 591, 594; 7 R. C. L. 27.

5.   See 2 Cal. Jur. 689, 697.

6.   See 10 Cal. Jur. 853; 10 R. C. L. 903.

APPEALS from judgments of the Superior Court of Shasta County. Walter E. Herzinger, Judge. Affirmed.

The facts are stated in the opinion of the court.

John F. Barnett for Appellant.

Carr & Kennedy for Respondent.

THOMPSON, J., *pro tem.*—These are actions, tried jointly upon an alleged promise of defendant Grizzly Creek Lumber Company to pay the indebtedness of Shasta Mill and Lumber Company to the respective plaintiffs, for goods and merchandise sold and delivered. By stipulation both cases were submitted on the same evidence. The defendant Shasta Mill and Lumber Company defaulted. Both plaintiffs had judgment as prayed for. For convenience the Grizzly Creek Lumber Company will be referred to as defendant.

The Shasta Mill and Lumber Company was operating a lumber mill in Shasta County. It was indebted to plaintiff McCormick Saeltzer Company in the sum of $982.69 and to plaintiff Redding Feed Company in the sum of $598.71 for merchandise sold and delivered. The evidence disclosed but one other outstanding debt to Miles & Westover for $3,500 for stumpage. The defendant Grizzly Creek Lumber Company was incorporated March 26, 1920. This corporation was promoted by J. T. Reed and W. L. Whitaker. They were also the principal stockholders. The others were mere nominal stockholders. Reed became president and Whitaker secretary. John F. Barnett was their attorney, also attorney for the Grizzly Creek Lumber Company as well as vice-president and director. Mr. Barnett was practically the only material witness for defendant at the trial. Much of his evidence was hearsay and incompetent, and admitted over the objection of plaintiff, as the trial court said, because there was no jury. It must be assumed the trial court disregarded this hearsay evidence.

Harry E. Scott was the president of the Shasta Mill and Lumber Company. April 1, 1920, negotiations began between the Grizzly Creek Lumber Company and the Shasta Mill and Lumber Company for the purchase of the latter

corporation and equipment.   April 7th a majority of the
members of the boards of directors of both corporations
met at the office of Elmer E. Robinson, attorney for Shasta
Mill and Lumber Company.   In a conference at this office
an oral agreement was entered into between the respective
parties, for the purchase and sale of the entire milling busi-
ness, stock and equipment of the Shasta Mill and Lumber
Company for a consideration of $2,500 cash, the defendant
agreeing to assume and pay, in addition thereto, the out-
standing indebtedness of the Shasta Company in an ag-
gregate sum not to exceed $5,000.   Mr. Scott maintains that
throughout these negotiations Reed and Whitaker held
themselves out as the representatives of the Grizzly Creek
Lumber Company.   The sale was consummated on or about
the 12th of April, according to the terms mentioned.   The
capital stock, stumpage contracts, equipment and all prop-
erty of the Shasta Company was thereupon transferred to
Reed and Whitaker.   Mr. Scott was given $1,000 in cash
and three promissory notes of $500 each, signed by Reed
and Whitaker.   The Shasta Company board of directors
then resigned and Reed, Whitaker and Barnett were im-
mediately elected directors of that corporation, and assumed
control thereof.   Reed and Whitaker then immediately
agreed to transfer all the property of the Shasta Company
to the Grizzly Creek Lumber Company, including stump-
age contracts with Miles and Westover, in consideration of
$85,300.   They were to receive $75,000 in capital stock of
the Grizzly Creek Company and $10,300 in cash.   This
was done.   Shortly thereafter all the property of the
Shasta Mill and Lumber Company was assigned and trans-
ferred to the Grizzly Creek Lumber Company.   At this
time Reed, Whitaker and Barnett were all officers and di-
rectors of both corporations.

Subsequently the Oregon Pine Lumber and Box Company
entered into a contract with the Grizzly Creek Lumber
Company for the purchase of its output of lumber.   Mr.
W. H. Pyburn president of this Oregon Pine Lumber Com-
pany, testified that they advanced upon this contract the
sum of $1,000, which was the initial sum paid upon the
purchase of the Shasta Lumber Company.   The Grizzly
Creek Lumber Company did not prosper.   The debts of the

Shasta Company were not paid, and these suits were therefore prosecuted.

[1] The defendant maintains that the evidence does not support the findings of the court to the effect that in the purchase of the property of the Shasta Company, and the promise to assume and pay its debts, Reed and Whitaker were acting as the representatives of the Grizzly Creek Lumber Company; that a certain written proposed agreement of sale referred to in the evidence, but which was never signed or accepted by the parties, was wrongfully excluded from the evidence; and that the evidence of Harry E. Scott respecting the agency of Reed and Whitaker was conflicting and not worthy of credit.

Mr. Scott, the former president of the Shasta Mill and Lumber Company, testified respecting the agency of Reed and Whitaker to bind the Grizzly Creek Lumber Company to assume and pay the outstanding debts of the former corporation, as follows: "We started negotiations with the Grizzly Creek or with Reed and Whitaker about the first of April, 1920, to make a sale of the stock and holdings of the Shasta Mill & Lumber Company . . . Mr. Reed and Whitaker and Barnett, the attorney, were present . . . The consideration was $2500 in cash, of which $1000 was to be paid at that time, and that the Grizzly Creek Lumber Company was to assume and pay all indebtedness against the Shasta Mill & Lumber Company. . . . There was $1000 paid at that time, and three notes of $500 each given. . . . Mr. Reed was the president of the Grizzly Creek Lumber Company at that time, . . . and Mr. Whitaker was secretary. . . And that was the consideration for the agreement just described. . . . It embraced the accounts owing to the McCormick Saeltzer Company, . . . and the Redding Feed Company. . . . We would never have turned it over had we realized that there was going to be any trouble about these bills, because that was the main object we had in turning it over, was to get our indebtedness paid up. . . . The goods were delivered to the Shasta Mill & Lumber Company."

On cross-examination Mr. Scott further testified: "Q. Are you correct in stating that a sale was made to the Grizzly Creek Lumber Company? A. I am correct, to this extent, that J. A. Reed and Mr. Whitaker who represented

the Grizzly Creek Lumber Company— Q. (Interrupting.) You say they represented that company . . . isn't it a fact that you were dealing with these men personally, in their personal capacity? A. Mr. Reed and Mr. Whitaker were the parties with whom we were negotiating. Q. Is it not a fact that nobody ever said to you during those negotiations that Reed and Whitaker were representing the Grizzly Creek Company? A. That is a fact. Q. You just jumped at the conclusion. A. No, they represented themselves as the Grizzly Creek Lumber Company. . . . We recognized them as representing the Grizzly Creek Lumber Company. . . . My dealings were with J. T. Reed and Whitaker representing themselves to be the Grizzly Creek Lumber Company. . . . This company was supposed to have a mill in Humboldt county, and Mr. Reed represented to me, and to Mr. Thomas and Robinson that they could not get their mill started, and they wanted to get immediate action, and were looking for a mill like Shasta ready to operate, and when we entered into negotiations with them, we supposed we were doing business with a going concern, and Reed and Whitaker were supposed to represent that concern. . . . There is no question in my mind but that they represented themselves as the Grizzly Creek Lumber Company. . . . The capital stock was made over to the names of Reed and Whitaker."

It was admitted that at the time of these negotiations the Grizzly Creek Lumber Corporation was already incorporated, and that Reed was its president and Whitaker its secretary. All the Shasta property and assets were immediately transferred to the Grizzly Creek Company, and the initial payment of $1,000 was made by the Grizzly Creek Company from money advanced on contracts for output of lumber paid to it by the Oregon Pine Lumber Company.

The testimony of Scott is not conflicting, but seems entirely consistent. It is also in harmony with the conduct of the parties in the entire transaction. Neither Reed nor Whitaker was called to contradict these statements. If it be a fact that someone had drawn a tentative agreement of sale, which was never signed or accepted by the parties, in which the names of Reed and Whitaker appeared as purchasers, that would not be conclusive. For Reed and Whitaker did in fact take the capital stock in their own names, but imme-

diately transferred all property over to the Grizzly Creek Company. They were the promoters of that company. The evidence taken as a whole is sufficient to support the findings to the effect that Reed and Whitaker acted as agents for the Grizzly Creek Lumber Company, and bound it in their promise to pay the obligations of the Shasta Company. Nor was there error in excluding the document which was neither signed nor accepted by any of the parties.

[2] It appears from the evidence, and chiefly from the admissions of Mr. Barnett, that Reed and Whitaker were the promoters of the Grizzly Creek Lumber Company; they owned practically all the stock, 7,500 shares having been issued to them. The other stockholders were mere nominal ones, holding not more than one to five shares, merely to comply with the law and qualify them as directors. They employed Mr. Barnett, the attorney, and dominated the affairs of the corporation. Reed, Whitaker and Barnett held the principal offices of the corporation, namely, president, vice-president and secretary. All three were present at the time the agreement to assume the obligations of the Shasta Company was made. They became the directors and controlling factors of both corporations. They planned and executed the transfer of property. While, strictly speaking, this corporation may not be said to be what the law calls a "one-man corporation," evidently it was a two-man corporation. The principle is the same. Under such circumstances the conduct, actions and promises of these officers, constituting a controlling majority of the board of directors, will bind the corporation. The corporation will be deemed to have knowledge of their conduct and contracts. [3] Having obtained and held the property constituting a material part of the contract of purchase, the corporation will be estopped from denying its obligation to pay the debts, which was a material part of the agreement. Having accepted the fruits of the contract, it may not refute the burdens. (Civ. Code, sec. 1589; 3 Cook on Corporations, No. 712, p. 2237, and No. 716, p. 2290; 14A Cor. Jur. No. 2228, p. 368, and No. 2241, p. 387; 10 Fletcher on Corporations, No. 2199, No. 2207, p. 370.)

In *Goodwin* v. *Central Broadway Building Co.*, 21 Cal. App. 376 [131 Pac. 896], it is said: "Where with full knowledge of all the facts involved, a principal reaps the

fruits of an unauthorized contract of his agent, and for some time yields acquiescence to its provisions, he will be deemed to have ratified it, and will be estopped . . . from repudiating it. And this doctrine applies to corporations equally with individuals. (*Gribble* v. *Columbus Brewing Co.*, 100 Cal. 71 [34 Pac. 527, 529]; Clarke on Corporations, p. 278.)''

[4] The appellant contends that the corporate entity of the defendant, in contemplation of law, is separate and distinct from that of the individual officers, or stockholders, and that therefore it cannot be held responsible for their acts or promises. In *Erkenbrecher* v. *Grant*, 187 Cal. 7 [200 Pac. 641], it is said: ''While it is the general rule that a corporation is an entity separate and distinct from its stockholders, it is also equally well settled that both law and equity will, when necessary to circumvent a fraud, protect the rights of third persons, and to accomplish justice disregard this distinct existence and treat them as identical. . . . '' In order to cast aside this legal fiction ''the law is not scrupulously particular in discriminating between the contracts of one who practically owns all the stock of a corporation and controls its affairs, as to whether he has executed a contract relating to the corporate business in his individual or corporate capacity.'' (*Swarz* v. *Burr*, 43 Cal. App. 445 [185 Pac. 411].)

[5] The exclusion of the tentative agreement was not error. It appears that it was not signed by any of the parties. It appears to have been rejected by Reed, Whitaker and Barnett. The contents of the instrument do not appear in evidence. The court permitted it to be marked for identification, and yet it does not appear in the record on appeal. There was no application to supply it by diminution of the record or otherwise. It was negligence on the part of appellant to have permitted the settlement of the transcript on appeal under the alternative method provided by section 953a, Code of Civil Procedure, without including this document, if he wished to use it on appeal. (*Espinosa* v. *Gould*, 47 Cal. App. 316 [190 Pac. 481].) Since it is not included in the transcript, and the contents of the document are not before this court, it is impossible to determine whether it was competent or not. Therefore, in the absence of any showing to the contrary, this court must assume

that the ruling of the trial court in excluding the document was proper. (*Espinosa* v. *Gould, supra;* 2 Cal. Jur., sec. 395, p. 689, and sec. 401, p. 697; *Beck* v. *Schmidt,* 13 Cal. App. 448 [110 Pac. 455] ; *San Francisco Commercial Agency*. v. *Hogan,* 6 Cal. App. 408 [92 Pac. 312].)

[6] Nor was it error to sustain an objection to the following questions with relation to that written document which was before the court, to wit: "Q. Now, what is the subject of that agreement; that is an agreement of sale, is it not?" And: "Q. What is dealt with in that agreement as a subject of sale?"

The instrument itself was the best evidence of the subject matter and of its contents. The objection was sustained on that ground. This ruling was correct.

The judgments are therefore affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 29, 1925.