[L. A. No. 13339. In Bank.—February 29, 1932.]

ARTHUR M. LOEB, Respondent, v. H. J. KIMMERLE et al., Appellants.

146

H. J. Kimmerle, *in pro. per.,* and Tanner, Odell & Taft for Appellants.

Paul Barksdale D'Orr and Thomas A. Reynolds for Respondent.

CURTIS, J.—This case came to us by an order of transfer here after decision by the District Court of Appeal of the Second District, Division Two. We were unable to agree with the conclusion of said court that the judgment against the defendant Spurlin should be reversed for the reasons stated in the opinion of said appellate court, or for any reason appearing in the record. We were, and now are, in accord with the conclusion reached by said court that the judgment for compensatory damages is excessive and should be reduced from the sum of $50,000, the amount fixed by the verdict of the jury, to the sum of $25,000.

We adopt as a part of our opinion the following from the opinion of the District Court of Appeal:

"Each defendant has appealed from the judgment rendered in this case which was in favor of the plaintiff in the sum of $50,000 compensatory and $2,948.60 actual damages. We shall consider first the appeal by DeKalb Spurlin.

"The action was one to recover for the injuries inflicted upon respondent as the result of an assault and battery by the appellant Kimmerle. The testimony adduced by respondent indicated that his left eye was injured to such an extent that it was rendered blind, his left malar bone was fractured, his nose injured, one hand hurt, together with other minor injuries. The appellant Spurlin took no part in the actual beating which was administered. It was claimed by respondent that Spurlin and Kimmerle were jointly interested in the act and had an understanding that they were going to rid a committee of Julian Petroleum Corporation stockholders of which Loeb and Spurlin were members, of either what is called the 'Jewish' or perhaps the 'Julian' interest. It is now the contention of this appellant that the evidence is insufficient to warrant the implied finding of the jury that he was a conspirator or in other words united and cooperated in the assault. A *résumé* of the testimony produced by respondent and pertinent to the question thus raised follows: The respondent Loeb, the appellant Spurlin and L. L. Horchitz, ——— Conlon, ——— Rubin and C. C. Julian were elected at a mass meeting held June 10, 1927, the members of a stockholders' committee of the corporation. Spurlin was elected chairman. There existed factional differences among the stockholders which were apparently carried over into the committee. L. L. Horchitz was made secretary of the committee and two rooms were secured for its use in the Wilcox building. On June 20th, at a meeting of the committee attended by Loeb, Spurlin, Horchitz and Rubin, Loeb offered a resolution that Spurlin resign as chairman thereof and according to the testimony of the respondent 'Mr. Spurlin bolted out of the door; he never waited to hear the end of it'. The respondent also testified that he remained in the office until 'four or half past four', but did not see Spurlin again that afternoon or evening. However, the appellant Spurlin took his evening meal at the home of and stayed all night with his friend whom he had known for twenty years, the other appellant, H. J. Kimmerle, where they discussed the happenings of the afternoon, although it was testified by the former that he 'went out with the primary purpose of listening to Julian on the radio'. Mr. Horchitz arrived at the committee's offices the following morning about 8:40 or 9 o'clock. Mr.

Spurlin was already there and met him at the door with the statement: 'I don't want you here, get out,' at the same time holding the door, whereupon Horchitz forced his passage, breaking the glass in the door in his successful effort. This altercation was reflected in the daily press, which at the time followed very closely every incident connected with the Julian affair. Kimmerle, reading an account of the incident, called up his friend Spurlin to ascertain if he had been hurt and arranged to met him about noon either at the office or at a nearby restaurant for lunch. It was also arranged that Kimmerle would if possible make arrangements for other and different offices in the Stock Exchange building and assist Spurlin in moving that afternoon. They met at the luncheon establishment and there they were interviewed by a reporter for one of the daily newspapers, who testified that the appellant Spurlin asked him to come back to his table; that he went and was there introduced to the appellant Kimmerle; that they briefly discussed the fight which had taken place that morning, whereupon in the words of the witness, Spurlin 'told me if I wanted to see some action or see something doing, to come up to the Wilcox building to that office that afternoon. I asked him what he meant, I asked him to explain, but he did not. He just said to be up there. Then I asked him who Mr. Kimmerle was. He said "This big Irishman is a friend of mine and is going to see that I get a square deal." Mr. Kimmerle said: "Yes that is it." ' Mr. Carey went to the offices of the committee during the afternoon, but too late for the 'action'. As reporters will, he asked Kimmerle what had happened and was referred to Spurlin. The latter responded to an inquiry as to what had happened to Loeb as follows: 'We have sent him back to C. C. Julian where he belonged.' Another newsgatherer, representing a different newspaper, was present and an eye-witness of the fracas. After Loeb had been forcibly and violently ejected this reporter, a Mr. Bolger, said to Kimmerle (Spurlin being present according to the witness' recollection), 'You know that Spurlin is a physical coward,' to which Kimmerle replied: 'Yes I know that, and that is why I am here,' and also volunteered the information that 'the Jewish element was to be eliminated—the committee had been made up of a majority of Jews, and they were to be eliminated and that they had done their work and

they had gone now, that they had been put there for a pur-
pose and their purpose had been satisfied and they had
gone'. Within five minutes of this conversation Bolger
asked Spurlin if the committee would continue to function
and Spurlin said to him: 'When you burn one rat the rest
will usually leave the ship; and he didn't expect any of the
committeemen would be back.' Another eye-witness was
J. A. Oldaker, who testified that immediately after this un-
fortunate affair Mr. Kimmerle announced to all who were
in the room and in the immediate presence of the appellant
Spurlin that 'he came up there to clean house and he was
going to clean it out'. The manager of the Wilcox building
testified that shortly after the assault Spurlin invited him
and Kimmerle into the inner office, where Kimmerle made
the statement that 'Mr. Spurlin was very nervous and quite
sick over being pushed off the committee, and that he was
there to clean house'. After the offices had been moved and
on June 23, the stockholders' committee issued a statement
over the name of the appellant Spurlin, as chairman, asking
for proxies in which it was said among other things: 'Since
organizing this committee we have been side tracked and
hampered by insidious propaganda from many quarters. It
has been a real battle, one which has not only required moral
courage but physicial strength, and in order to purge this
committee of these individuals with sinister motives we have
been required to use both moral and physical strength, and
where necessary we have not failed to use both.'' This pro-
nouncement follows one earlier in the report to the effect
that the respondent Loeb in a time of excitement had stated
that he had been put on the committee 'by C. C. Julian for
C. C. Julian, and that he had no stock and no interest in the
stockholders.' Not only this pamphlet purported to be issued
by the committee with the appellant Spurlin as chairman, but
also there is evidence that Spurlin and Kimmerle and others
consulted about it before it was printed; that while Spurlin
may not have seen the exact language first quoted, neverthe-
less to told Kimmerle to 'go ahead—fix it up'. We must add
one more significant bit of testimony before we proceed to an
examination of the sufficiency of the evidence. The respond-
ent testified that he was sitting in the outer office reading a
newspaper then the appellants returned from luncheon;
that appellant Spurlin stepped over to him and said: 'Mr.

Loeb, would you mind accompanying me into the inner office? I want to speak to you'; that as soon as they entered the inner office the appellant Kimmerle stripped for action by removing his hat and coat; that the last-named appellant took a seat at the desk opposite the respondent, whereupon the following occurred: Spurlin remarked to Kimmerle 'This is one of the Jews' and the latter said: 'What the hell are you doing around here? Who the hell sent you up around here?' Respondent queried: 'With what authority do you speak to me?' Kimmerle, striking his fist on the desk, responded: 'Never mind who I am, you are sent up here by C. C. Julian,' whereupon, the respondent says, he walked out of that office and to the desk in the outer office followed by Kimmerle and it was there the attack took place.

"Of course, there is testimony in the record contrary to much of that which we have set down. For example, appellant Spurlin testified that it was respondent who bolted the meeting of the 20th and not he; that he did not know that the reference to the use of force was in the report to the stockholders until after it was printed and delivered; and that he had telephoned to the police station after the altercation with Horchitz and arranged for an officer to be present at about 1 o'clock P. M.

"The question with which we are confronted, however, is not whether the evidence is ample to have supported a contrary verdict, nor whether we think the weight of evidence points to a different result, but whether there is substantial evidence which, if believed, warranted the jury in arriving at the conclusion to which it came.

"The test by which we are to determine the liability of the appellant is this: Did he unite or cooperate in inflicting a wrong upon the respondent? In *More* v. *Finger*, 128 Cal. 313–319 [60 Pac. 933, 935], it is said: 'Plaintiff is entitled to relief for the injury from such of the defendants as she can show have united or cooperated in doing her the wrong.' To the same effect reference may also be had to *Nevin* v. *Gary*, 12 Cal. App. 1 [106 Pac. 422], and *Revert* v. *Hesse*, 184 Cal. 295 [193 Pac. 943]. In *Smith* v. *Blodgett*, 187 Cal. 235–242 [201 Pac. 584], the same rule is phrased in these words: 'It is the civil wrong, not the conspiracy which constitutes the cause of action, and therefore, the plaintiff may bring his suit along any lines which he deems most

likely to afford him redress for the particular injury which he has sustained, and, if successful in proving an injury of the nature claimed, may recover judgment in that action against all those who have united or cooperated in inflicting that injury.' (See, also, *Frost* v. *Hanscome,* 198 Cal. 550 [246 Pac. 53].)

'Applying the test to the present situation what must we say are the allowable deductions from the recited testimony? The resolution was directed towards the removal of Spurlin and not of Kimmerle, the latter of whom was not even a member of the committee. The invitation to Carey to witness some action was issued by Spurlin and not by Kimmerle. It was Spurlin as chairman of the committee who reported that they had not hesitated to use force. True, Kimmerle participated in the preparation of the report and talked it over with Spurlin and prepared the final draft at Spurlin's direction, but we repeat he was not a member of the committee. Again it was Spurlin who invited respondent into the inner office for a few words, but without protest of any kind permitted Kimmerle to prepare for the assault by removing the handicap of his coat and immediately, in response to Spurlin's statement, 'this is one of the Jews', launch his verbal assault. Spurlin stood by while his friend of many years' standing and at whose house he had stayed the night before announced that he had come 'there to clean house and he was going to clean it out' and it was Spurlin who made the remark that 'When you burn one rat the rest will usually leave the ship.' Leaving out of consideration for the time being the contrary testimony and reducing that set forth to its significant elements it is impossible to say that the jury was not justified in deducing therefrom that appellant Spurlin was the mental participant and Kimmerle the physical—that they were acting in concert and each knew the intent and purpose of the other.

"Appellant next assails the judgment because, he says, the verdict is against law and gives as his reason therefor the fact that the complaint did not charge or set out facts indicating a conspiracy so as to warn him that he was being held as a party to the assault because he did conspire with Kimmerle. In our discussion of the previous contention we have already observed that 'it is the civil wrong, not the conspiracy, which constitutes the cause of

action' (*Smith* v. *Blodgett, supra*). In *Herron* v. *Hughes*, 25 Cal. 555, we find this succinct statement of the rule, which has been quoted with approval in the more recent case of *Bowman* v. *Wohlke*, 166 Cal. 121 [Ann. Cas. 1915B, 1011, 135 Pac. 37]: 'Where two or more are sued for a wrong alone, it may be necessary to prove previous combination in order to secure a joint recovery, but it is never necessary to allege it, and if alleged it is not to be considered as of the gist of the action. That lies in the wrongful and damaging act done. In *Saville* v. *Roberts*, 1 Ld. Raym. 378, Mr. Chief Justice Holt said: "An action will not lie for the greatest conspiracy imaginable if nothing be put in execution, but if the party be damaged the action will lie. From whence it follows that the damage is the ground of the action, which is as great in the present case as if there had been a conspiracy." ' So, too, in *More* v. *Finger, supra*, it is said in addition to what we have already quoted: 'The complaint alleges that the plaintiff was deprived of the note by the wrongful acts of the defendants, and that they entered into a conspiracy for that purpose, but the conspiracy thus alleged is not the gist of the action. The gist of the action is the injury done to the plaintiff by these wrongful acts, and this injury is actionable whether it is the result of a conspiracy or not. The averment of a conspiracy is immaterial, and could be proved without such averment, or, if averred, need not be proved.' Considerable reliance is had by appellant upon the case of *McPhetridge* v. *Smith*, 101 Cal. App. 122 [281 Pac. 419], but we find no statement therein which indicates that in an action for the tort of two or more persons it is essential to a recovery against an indirect actor and participant therein that he confederated and conspired with the one who directly acted. In fact, the case is in full accord with those authorities from which we have already extracted excerpts. Sound reason brings us to the same conclusion. The actionable wrong is the tort committed. The liability is determined by the ultimate fact of whether the defendant participated in the commission of the wrong. The evidence establishing the conspiracy is merely proof of the ultimate fact.

"A number of instances where testimony on cross-examination or direct was excluded by the court are assigned as error. Some of these instances are objections sustained to

the questions of the other defendant of which this appellant may not complain, another is supported by neither argument nor citation of authority and in the case of at least one assignment the question was already asked and answered. It is unnecessary to comment further upon them, but there is one line of proffered evidence which we find demands considerable attention.

 ''The plaintiff introduced a chain of circumstances to show Spurlin's connection with the assault.· Kimmerle contended and testified that upon his arrival at the office of the committee on the afternoon of June 21st he attempted to talk to Loeb about adjusting the friction existing among the members of the committee and read a resolution adopted at the mass meeting of the stockholders to the effect that the people who had put up the money for stock should be in charge of the affairs of the Julian Petroleum Corporation; that thereupon Loeb said: 'I do not know anything about such a set of resolutions; I am sent up here by C. C. Julian for C. C. Julian; I do not care a damn about any resolutions'; that thereupon, he, Kimmerle, told respondent that he didn't belong in the office of the committee but did belong in C. C. Julian's office and ought to go there: that thereupon Loeb attacked him. During the cross-examination of the respondent appellant's counsel ascertained that Horchitz had called respondent on the telephone after the fight between Horchitz and Spurlin in the morning and attempted to elicit from him a conversation to the effect that Horchitz had told him to come on up to the committee's rooms and not to be a coward and to show thereby, inferentially at least, that Loeb had come up anticipating trouble, thus tending to corroborate Kimmerle's version of the affair and the version of appellant Spurlin that arrangements had been made for the presence of a police officer so that the move to the new offices might be made peaceably. The respondent argues that it is immaterial what Horchitz may have said to respondent and further that assuming its materiality Horchitz admitted the conversation and hence its rejection becomes harmless. We entertain no doubt that the testimony was material, that the cross-examination should have been permitted particularly in view of Spurlin's account of the meeting on the afternoon of the 20th to the effect that it was respondent who left the meeting and not he. It is difficult for us to conclude

that the error was prejudicial for the reason that Horchitz subsequently testified that he did telephone to the respondent and say that he didn't want Loeb to abandon the ship and act a coward just at that time. Loeb responded to the request and appeared. There is no contradiction of the testimony of Horchitz and we fail to see how respondent's statement of the same matter could have altered or affected the result.

"The same. disposition must be made of appellant's claim that police officer Hynes was not permitted to testify concerning his assignment to the Julian case and that when he did start for the offices at about 1 P. M. on the 21st he was invited to lunch by Horchitz. He was permitted to state that Spurlin had called him twice, once about 10 A. M. and once about 12 noon, asking him to be present and that he did go to lunch about 1 o'clock with Horchitz and the latter testified that it was at his invitation.

"Complaint is also made of remarks of the judge concerning the materiality or effect of evidence as the trial proceeded, while ruling upon objections. It is sufficient to say that we have scanned the record in vain to find where counsel directed the trial judge's attention to this claimed misconduct for the purpose of rectifying the damage if any was done. On one occasion when such a course was pursued the judge did admonish the jury to disregard his remarks, thus indicating no desire on his part to influence them by suggestion. And of course under a familiar rule, to support which it is unnecessary for us to cite authorities, it is impossible for us to sustain appellant's position.

"The respondent's wife was asked to testify concerning his average income for a period of ten years prior to the trial. No objection was interposed that the proper foundation had not been laid, nor that the testimony was hearsay. The witness was cross-examined as to her knowledge and the means by which she came to that knowledge. Some time later in the trial counsel made a motion to strike her testimony 'on the earnings of her husband'. We cannot support the claim of appellant. He 'cannot lie by and take a chance upon an answer being favorable and, when disappointed, have a motion to strike out take the place of an objection'. (*Price* v. *Northern Elec. Ry. Co.*, 168 Cal. 173 [142 Pac. 91, 95].; *People* v. *Lawrence*, 143 Cal. 148 [68

L. R. A. 193, 76 Pac. 893]; *Pinto* v. *Seeley,* 22 Cal. App.
318 [135 Pac. 43].)

■ "It is next claimed that the court committed error
during the cross-examination of Mr. Carey, who it will be
remembered testified that he met Mr. Spurlin at the luncheon
establishment on June 21st just previous to the affray; that
Spurlin invited him back to the table where Kimmerle was
and informed him that if he wanted to see some action or
see something doing, to come up to the Wilcox Building that
afternoon, and further that in response to a query as to who
Mr. Kimmerle was, Spurlin replied, 'This big Irishman is
friend of mine and is going to see that I get a square deal.'
After being confronted with his testimony before the grand
jury on another feature he was shown the transcript of his
testimony in a previous civil action wherein the respondent
here was plaintiff and Kimmerle was defendant, which testi-
mony read that Spurlin replied to the inquiry that Kim-
merle was a friend of his, leaving out all reference to 'big
Irishman'. Counsel then asked Carey why he did not at the
time of giving the testimony just referred to use the designa-
tion 'big Irishman' and the court very properly sustained an
objection on the ground that the question was argumentative.
Then counsel queried: 'Well, did he say "big Irishman",
or didn't he?' An objection that it was immaterial was
promptly sustained. Without doubt this was error and an
altogether too restricted view of the proper cross-examination
of the witness. Whether the error requires a reversal of the
action must await a later paragraph.

■ "It is also argued by appellants that the plaintiff
and the jury were guilty of misconduct of such nature as
to necessitate a retrial of the issues. The circumstances
appearing from the affidavits in support of this contention
are as follows: On the opening day of the trial a Mrs.
Chester Brown, who had been serving with the jury panel,
was drawn as a prospective juror. She was examined and
passed for cause. However, she was peremptorily challenged
by the plaintiff, it subsequently appearing that she was the
wife of a gentleman whom the plaintiff had known in South
America several years before. That during the first recess
after being excused Mrs. Brown engaged in conversation with
the plaintiff and his wife and thereafter during the trial of
the action, as she was not needed elsewhere as a juror, she

remained in attendance during the remaining sessions. She also during the same time conversed with members of the jury. The jury was instructed and charged with the delivery of a verdict about 10:45 o'clock A. M. on the morning of March 15, About 11:30 A. M. of the same day Spurlin was about to leave the courtroom when the clerk stated that he had better wait a few minutes because unless they arrived at a verdict before noon it would be necessary for each side to pay one-half of the expenses of luncheon. What occurred next is subject to conflicting versions. The appellant and one of his counsel aver that Mrs. Loeb said: 'Why Mrs. Brown has invited the jury and us out to lunch,' whereas one of plaintiff's counsel says the remark was: 'Mrs. Brown said she intended to take the jury out to lunch today.' They also differ as to the response of the clerk of the court, counsel for appellant averring that he said to Mrs. Loeb: 'You can't do that. The case has not been decided,' and counsel for respondent swearing that the clerk responded that Mrs. Brown had been planning for some time to give a lunch to the members of the panel when they had completed their service. The appellant averred that he had been informed and believed and therefore swore that the jury and Mr. and Mrs. Loeb did actually have lunch at about 1:30 P. M. of the same day with Mrs. Brown at her residence. This was after verdict rendered. There is no denial of this averment either from counsel or from the plaintiff or his wife and it being a matter particularly within the knowledge of Mr. and Mrs. Loeb, we must assume it to be true. We are, however, faced with this problem. If the invitation were extended to the members of the jury and before verdict, so that they understood that the Loebs would be present it was a most serious interference with the due administration of justice and should not be countenanced. If, however, the invitation had not been extended, but was only an unexpressed intent, there was no such interference. The trial judge upon the motion for a new trial resolved that question in favor of the respondent and we are bound by his determination of that question of fact as fully as we would be upon any other issue of fact.

██ "We now turn to appellant's claim that the court misinstructed the jury. Our attention is directed to an instruction covering the subject of the liability of one who

does not actually participate in the commission of an assault for the damages resulting therefrom when done by another. In general the instruction is a correct statement of the law, but we find in it this serious misstatement: 'If one man carries out a plan originated by both of them, *or carries out a plan originated by one of them for the benefit of the other or for the benefit of both of them,* they are equally to blame in the eyes of the law and equally liable for any injury or damages inflicted.' (Italics ours.) While the remainder of the instruction was correct, we must observe that in a latter part the court told the jury that the plaintiff was required to prove his case by a preponderance of the evidence 'bearing in mind all of the instructions of the court as to the liability and responsibility of one defendant for the acts of another'. The first-quoted part of the instruction is so complete in itself that even though the latter part correctly stated the law, yet the most that we can say is that they are contradictory and we have no way of knowing which the jury accepted as their guide. We have already stated the test by which the liability of this appellant should have been determined. Certainly he could not be responsible for the origination and execution of a plan by his codefendant without his cooperation even though it were for his benefit.''

It is earnestly contended by the defendant Spurlin that the foregoing errors are sufficient to demand a reversal of the judgment against him. It may be conceded that the evidence when considered as a whole is very close concerning the participation of the defendant Spurlin in the assault upon the plaintiff. Defendant calls attention to the fact that the evidence shows that he had arranged for a police officer to be present at the time when the assault took place, and that it is unreasonable to believe that if he intended to commit an assault upon plaintiff he would want an officer of the law present at the time of such assault. This question, however, was one for the determination of the jury, and as long as there is to be found in the record substantial evidence in support of their verdict, it should not be disturbed on appeal unless it reasonably appears that the errors complained of materially influenced the jury in their deliberations and probably caused them to render a verdict which they would not have rendered had said errors not been committed. The defendant insists that

in at least two instances the errors committed by the court had that effect. One such error, defendant claims, was the giving of the instruction mentioned above, and the other error consisted of the remarks of the court in ruling on objections to the admissibility of evidence made during the trial.

We will first consider said instruction and the misstatement of the law contained therein and hereinbefore commented upon. The misstatement of law although quoted above is restated here, and is as follows: "If one man carries out a plan originated by both of them, or carries out a plan originated by one of them for the benefit of the other or for the benefit of both of them, they are equally to blame in the eyes of the law and equally liable for any injury or damages inflicted." The appellate court held that this was an erroneous statement of the law and although the latter part of the instruction contained a correct statement of the law, the two statements were in conflict and that, "We have no way of knowing which the jury accepted as their guide." While this conclusion of the District Court of Appeal is literally correct, yet when we consider the instruction as a whole, and carefully examine the two statements which are held to be conflicting, we seriously question whether the jury had any difficulty in determining the proper course it should pursue under the direction of the court set forth therein. The latter statement of the instruction was as follows: "Unless you believe that the defendant Spurlin did so agree with the defendant Kimmerle on some plan to commit some wrongful act which resulted in an assault on the plaintiff, then your verdict should be for the defendant Spurlin." With this instruction as a whole before the jury, while as stated above we have no means of knowing which of the two conflicting statements the jury followed, yet it. is hardly reasonable to suppose that they accepted and followed the rather involved and obscure statement—or, more properly, misstatement of the law—contained in the first part of the instruction, rather than the clear, definite and explicit direction of the court given at the close of the instruction. We cannot feel that the jury were to any extent misled by anything contained in this instruction. The giving of it, therefore, is no ground for a reversal of the judgment.

 The contention that the remarks of the court in passing upon objections to the admissibility of evidence made during the trial unduly and improperly influenced the jury to the prejudice of the defendant Spurlin, we think is equally without merit. We have already discussed these remarks generally in a previous part of this opinion and held that no error was shown to have been committed by the court in the making of any of said remarks. A long list of these remarks has been culled from the record and set out in the defendant's brief. We have carefully gone over them and find but slight if any criticism of any of them. It is true that the court in a large number of instances ruled against the defendant. If the jury drew any improper inference against the defendant by reason of these adverse rulings, the unfavorable light in which the defendant was thus caused to appear was due not to any fault of the court, but to defendant's own lapse in asking improper questions or making untenable objections. If the defendant Spurlin was injured by this condition existing during the trial, and we very much doubt that he was, it was an injury of which he cannot complain as he brought it upon himself. It is not an injury that would justify a reversal of the judgment.

 We will now revert to the ruling of the court sustaining an objection to a question propounded to the witness Carcy and heretofore referred to and held to constitute error. It is contended by the defendant Spurlin that the ruling of the court in this respect was so erroneous and prejudicial to defendant's rights as to demand a reversal of the judgment. This witness did not appear personally at the trial, but his deposition had prior thereto been taken and it was produced and read at the trial. The ruling of the court of which defendant complains was made during the reading of this deposition and the objection, which the court sustained, was to a question which had been asked and answered by the witness in his said deposition. Whether the defendant was prejudiced by the court's ruling would depend upon the answer which was contained in the deposition. If the answer was favorable to the defendant then it might be held that he was prejudiced by the ruling of the court excluding the answer. On the other hand, if the answer was such that defendant was not

benefited or aided thereby, then he was not prejudiced by the refusal of the court to permit the answer to be read to the jury. The answer to the question, to which the court sustained the objection, is not before us, and we have no means of determining whether the defendant was or was not prejudiced by the sustaining of said objection. It is the duty of the defendant, who is one of the appellants in this case, to show error and prejudice during the trial before an appellate court may reverse the judgment. This the defendant has not done on this appeal in respect to the ruling of the court sustaining the objection of the plaintiff now under discussion. This precise point it appears has never been directly before the appellate courts of this state. In no case do we find that the courts have held that the appellant, before he can successfully complain of a ruling of the court excluding an answer given in a deposition, must incorporate the answer to such question in the record on appeal in order that the appellate court may pass upon the materiality of the question. We do find cases which in our opinion are alike in principle. There are numerous cases holding that before an appellate court will reverse a judgment on the ground that the trial court erred in sustaining an objection to the introduction in evidence of a written document, the writing itself must be made a part of the record on appeal and unless it is the judgment will be affirmed. In the case of *Euless* v. *Westphal*, 71 Cal. App. 611, 616 [235 Pac. 742, 744], we find language which is pertinent to the question now under discussion in which the court said, "If there was any evidence which would compel the court to interpret the letter as a binding contract of employment within the terms of the statute of frauds it was the duty of the appellant to place that evidence before us on this appeal. From the fact that he has not done so we may fairly assume that this evidence was adverse to him because if it had been favorable he would have placed the facts before this court so that we would have been in a position to determine whether prejudice resulted from the error complained of." In the case of *McCormick Saeltzer Co.* v. *Grizzly etc. Co.*, 74 Cal. App. 278, 285 [240 Pac. 32, 35], the trial court had excluded from the evidence a certain written instrument. In disposing of the error which the appellant claimed the trial

court committed in its exclusion the court said, "The contents of the instrument do not appear in evidence. The court permitted it to be marked for identification, and yet it does not appear in the record on appeal. . . . Since it is not included in the transcript, and the contents of the document are not before this court, it is impossible to determine whether it was competent or not. Therefore in the absence of any showing to the contrary, this court must assume that the ruling of the trial court in excluding the document was proper." The case of *Oldershaw* v. *Matteson & Williamson Co.*, 19 Cal. App. 179, 184 [125 Pac. 263, 265], is more nearly in point. There the trial court excluded a whole deposition, and the appellant assigned this ruling as error and appealed on that ground. In deciding the case the court said, "Among the errors of law specified is that the court erred in excluding the deposition of C. D. Oldershaw and Annie Cox Oldershaw. It appears that the depositions of these parties were offered in evidence and objection thereto sustained upon the ground that the same were incompetent, irrelevant, immaterial and not proper cross-examination. The depositions, however, are not incorporated in the bill of exceptions, and hence the record contains nothing upon which the alleged erroneous ruling of the court can be reviewed." In *Adams* v. *Weaver*, 117 Cal. 42, 49 [48 Pac. 972, 974], the trial court rejected the deposition of one of the parties to the action on the sole ground that said party was present in court and was examined as a witness. On appeal the court held that the deposition was not properly rejected on said ground, but further held that it could not review said ruling for the reason that the deposition had not been incorporated in the record on appeal. In deciding this point the court said, "But the deposition is not in the record, and there is nothing there which gives the slightest intimation of its contents—except only 'that it was duly and legally taken'. Therefore, it does not, of course, appear that appellant was prejudiced by the ruling. . . . The judgment of a trial court will not be reversed for the exclusion of evidence, unless it appears that there was no sufficient ground for such exclusion. But in the case at bar the contents of the deposition may have been utterly immaterial, or inadmissible as evidence; and, therefore, the conclusion that the

court erred in excluding the deposition does not follow from the mere fact of its exclusion—the deposition itself not being before us.'' There can be no difference in principle in the rule which the court has invoked when the whole of a deposition is excluded as the result of a ruling of court than when only a part of such deposition, or single answer therein, has been ruled out by the trial court. On appeal it is utterly impossible for the reviewing court in either case to decide whether the party who sought the admission of this evidence has been injured or not by its exclusion unless the excluded evidence is in some manner brought to its attention. This is the condition in which we find the record in the present appeal. The excluded evidence is not before us. We have not the slightest intimation as to its nature or character. We are, therefore, unable to say whether the defendant Spurlin was injured or not by the action of the court in sustaining the objection to the question asked the witness Carey. No prejudicial error having been shown, the judgment should not be disturbed.

This disposes of all the questions raised by the defendant Spurlin, except that the verdict is excessive. The question as to the excessive amount of the verdict was considered by the District Court of Appeal in its discussion of the appeal of the defendant Kimmerle. We are in accord with the conclusion reached by the appellate court in determining that question and also its treatment of this case in so far as it affects the defendant Kimmerle. We adopt, therefore, as our own that portion of said opinion of the District Court of Appeal in which these matters are given consideration. It is as follows:

''We have yet to consider the appeal of H. J. Kimmerle.

██ ''This appellant says: 'The rulings made by the judge seemed to be constantly against me' and then refers to certain pages of the transcript where we may find examples. It is obvious that such a general statement is not a sufficient assignment of error either in the exclusion or rejection of testimony to warrant us in ruling upon any question. However, by reason of a reference in the opening brief of this appellant to the brief of the appellant Spurlin we have examined all of the assignments wherein it is claimed that the court committed error in the rejection of testimony offered by this appellant or in the admission

of testimony over his objection and it is sufficient to say that we can find nothing of which he can rightfully complain.

"It is next said that the verdict was excessive and that 'Loeb and his wife had testified to an earning capacity greatly in excess of the facts'. Here, too, it is patent that we are not authorized to consider the truth or untruth of their testimony. That duty rested with the jury.

"The adoption of the appellant Spurlin's brief on the point by this appellant, however, renders it necessary for us to examine the argument therein contained that the verdict of $50,000 for strictly compensatory damages is excessive, it being remembered that there was also awarded to the plaintiff the sum of $2,948.60 as special or actual damages. In addition to our former recitals of injury, to-wit: the loss of the left eye, a fracture of the left malar bone, an injury to the nose and one hand, we ought to set down that respondent's testimony also indicates that his general nervous system was affected; that from time to time he required sedatives to induce sleep; that at the time of the trial he was unable to read for more than fifteen minutes at a time by reason of the fact that reading brought on severe headaches; and that he had been up to the time of the trial unable to follow his business and had lost the power of concentration. There is testimony also to the effect that respondent is and had been for many years a contractor with an income therefrom in the neighborhood of $10,000 per annum. It should be noted, however, that in one of respondent's answers he admitted financial inability to enter into the contracting business, although he also asserted that his health would not permit it either. The life expectancy of respondent was shown to be 27.45 years. Can we say that the verdict is so large that it bears upon its face the imprint of passion or prejudice? Succinctly put, such is the test, codified in this state and found in subdivision 5 of section 657 of the Code of Civil Procedure and judicially announced as early as the case of *Aldrich* v. *Palmer*, 24 Cal. 513. To determine what is a just and reasonable compensation is a difficult task, one not possible of exact ascertainment. For that reason the assessment of damages is first of all the peculiar province of the jury and second, that of the trial

judge when passing upon a motion for a new trial. (*Reneau* v. *Hirsch*, 88 Cal. App. 1 [262 Pac. 1100].) Whence it follows that the appellate courts will not disturb the verdict unless it is so grossly excessive as to immediately suggest to the mind 'passion or prejudice, or corruption on the part of the jury' (*Reneau* v. *Hirsch*, *supra*, with cases there cited; *Morris* v. *Standard Oil Co.*, 188 Cal. 469 [205 Pac. 1073].) Some aid is furnished us by the precedent of *Maede* v. *Oakland High School Dist.*, 212 Cal. 419 [298 Pac. 987, 989], which was a case where a high school boy, aged fifteen, was injured by an explosion in the vocational training class of the Technical High school. As stated in the opinion, the injury resulted 'in the loss of one eye, a cut on the nose and slight cuts on the face'. The jury returned a verdict in the sum of $35,000. The District Court of Appeal under the announced doctrine refused to disturb it, although it was made to appear from the record that at one time the trial judge was inclined to believe it excessive. ([Cal. App.] 291 Pac. 874.) However, the Supreme Court transferred the cause to itself for decision and reduced the judgment to $16,000, saying on the point:

" ' 'We now come to the consideration of the question earnestly urged by appellants, which is whether or not the damages as assessed herein are so far excessive and disproportionate to the injuries sustained by repondent, as measured by other awards judicially sanctioned in this and other states of the Union as fair compensation for like injuries, as to require reduction on the ground that they ''appear to have been given under the influence of passion or prejudice''. (Sec. 657, Code Civ. Proc., subd. 5.) It being impossible to restore a lost member of the body, the law undertakes to do the next best thing humanly possible, in lieu of restoration, which is to compensate the loss with a money consideration. Out of the long experiences of the past, in which all the elements and inconveniences of loss have been considered, weighed and appraised, a standard, not invariable, it is true, has been adopted by courts of law. The average amount for particular injuries, as fixed by the verdicts rendered by juries and approved by courts has its place in arriving at the estimate. The compensation assessed in the instant case, compared with a long list of

cases in which the loss of an eye was, as here, the single damage to be compensated, so greatly exceeds the amounts of award in the average cases as to justify the claim on the part of the school district and the officers that the verdict of the jury was the result of passion and prejudice. It is rather coincidental that *Damgaard* v. *Oakland High School Dist.*, [212 Cal. 316, 298 Pac. 983], *supra*, presents a case in point of injury very similar in all respects to the instant case, even to the loss of an eye, caused through an explosion which occurred during an experiment conducted in the chemistry department of the same high school district in which respondent herein was injured. The jury in that case assessed the damage at $15,000. Respondent, here, did not suffer any damages greater than was suffered by the Damgaard youth. There is nothing in either case that would seem to justify a preference of one over the other. Nevertheless, out of an abundance of caution, we have concluded that a judgment of $16,000, will be just in the circumstances of the case.'

''We have also considered another element. As is said in *O'Meara* v. *Haiden,* 204 Cal. 354 [60 A. L. R. 1381, 268 Pac. 334], radical changes have taken place in social conditions in the past few years, particularly with respect to incomes and the cost of living. However, considering the rather unsatisfactory testimony of annual earnings as distinguished from income from investments, as well as the fact that the fracture of the malar bone was slight, and the verdict in the Maede case, we feel compelled to the conclusion that the verdict here could only have been arrived at as the result of prejudice and passion. For that reason it is excessive. In view of the fact that the testimony does indicate an extreme shock to the nervous system we think the amount allowed in the Maede case may in fairness be here increased and further that $25,000 will, as fairly as it is humanly possible, compensate the respondent for his loss.

''Appellant next presents the alleged misconduct of Mrs. Brown and the jury, but that matter was fully covered while considering the appeal of Spurlin.

''Finally appellant, without giving us any specific quotations from or reference to the transcript says that improper references were made to the case of the criminal assault

and the fact that he had been paroled. This, too, is an insufficient assignment of error.''

The judgment herein is modified by reducing the award of the jury for compensatory damages from $50,000 to $25,000 and as so modified said judgment is affirmed as to each of the two defendants.

Langdon, J., Preston, J., Shenk, J., Seawell, J., and Waste, C. J., concurred.